UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
GIANFRANCO "JOHN" BENTIVOGLIO,

                         Plaintiff,                                    18-cv-2040 (PKC)

              -against-                                                OPINION
                                                                       AND ORDER

EVENT CARDIO GROUP, INC., and
EFIL SUB OF ECG, INC.,

                         Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

             Plaintiff John Bentivoglio brought this action against defendants Event Cardio

Group, Inc. ("ECGI") and EFIL Sub of ECG, Inc.  ECGI is in the business of developing

technology relating to wireless heart monitoring and breast cancer detection.  The Court

previously dismissed all claims against EFIL Sub of ECG, Inc and all claims against ECGI,

except the breach of contract claim.  (See Doc 93 – Opinion and Order of November 27, 2019,

2019 WL 6341130.)  With discovery now closed, Bentivoglio moves for summary judgment on

the breach of contract claim for failing to pay certain consulting fees.  For the reasons that

follow, the motion will be granted.

BACKGROUND

             The facts below are undisputed except where otherwise noted.  Because the

allegations in this case are well described in this Court's prior Opinion and Order (Doc 93), only

a brief description of the facts follows.

Plaintiff John Bentivoglio founded ECGI in 2014 and was the sole director and officer of the entity from June 2014 to November 2016.  (Pl. 56.1 ¶ 2; Def. 56.1 Resp. ¶ 2.)[1] Although neither side features it prominently in their submissions, Bentivoglio sold 3.5 million shares of ECGI to Frank Sgro or an entity he controlled and resigned from ECGI. (Complaint at ¶ 16; Answer at ¶ 16; Doc 119 – Ex. 2 at ¶ 4(b).)[2]  In connection with Bentivoglio's resignation, Bentivoglio and ECGI entered into a Consulting and Special Projects Agreement ("Consulting Agreement") whereby he would provide offsite services to the company in exchange for a monthly payment.  (Pl. 56.1 ¶ 3; Def. 56.1 Resp. ¶ 3; Doc 119 – Ex. 3 (Consulting Agreement).) The agreement was for the period beginning on November 1, 2016 through October 31, 2020. (Id.)  Bentivoglio was to receive $125,000 per year for the four-year term, broken into monthly payments of $10,416.67, along with an "additional payment" of $1,000 per month.  (Pl. 56.1 ¶¶ 11–14; Def. 56.1 Resp. ¶¶ 11–14.)  The agreement contains New York choice of law and forum provisions, as well as a clause specifying that it is a fully integrated agreement.  (Pl. 56.1 ¶¶ 7–9; Def. 56.1 Resp. ¶¶ 7–9.)

ECGI paid Bentivoglio per the terms of the contract for the first three months. (Pl. 56.1 ¶ 20; Def. 56.1 Resp. ¶ 20.)  On January 31, 2017, ECGI sent Bentivoglio a "Dispute Resolution Notice Under Paragraph 15 of the [Consulting Agreement]" indicating that it planned to suspend the payments.  (Pl. 56.1 ¶ 21; Def. 56.1 Resp. ¶ 21.)  Accompanying the notice were two spreadsheets listing withdrawals from ECGI accounts that occurred prior to his resignation when Bentivoglio was the sole officer of the company, for which ECGI could not locate any business receipts.  (Doc 119 – Ex. 5.)  Many of the payments are alleged to be direct transfers to

---

[1] Citations to the parties' Rule 56.1 Statements are intended as a convenient reference to the evidence cited in those statements.
[2] In his initial Complaint, Bentivoglio asserted breach of fiduciary duty and "shareholder oppression" claims against Sgro that he dropped in his Second Amended Complaint.

Bentivoglio or payments on his behalf.  (Id.)  According to ECGI, Bentivoglio fraudulently induced ECGI into entering the Consulting Agreement by failing to disclose during negotiations that he had misappropriated corporate funds and rendered the company insolvent.  (Def. 56.1 Resp. ¶¶ 27–30.)

Despite sending the January notice, ECGI continued payments for four more months, suspending payments indefinitely in June 2017.  (Pl. 56.1 ¶¶ 26–27; Def. 56.1 Resp. ¶¶ 26–27.)  Bentivolio has come forward with evidence, and ECGI does not dispute, that the remaining payments under the Consulting Agreement total $427,083.47 in fees and $41,000 in "additional payments."  (Pl. 56.1 ¶ 29–30; Def. 56.1 Resp. ¶ 29–30.)

SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law. . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' "  Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant."  Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  If the moving party meets its burden, "the nonmoving

party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' " Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.' " Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Simsbury-Avon Pres., 575 F.3d at 204 (internal citation omitted).

DISCUSSION

Bentivoglio moves for summary judgment on his breach of contract claim, arguing that that he is entitled to judgment as a matter of law as to both liability and damages. He asserts that ECGI does not dispute the existence of the Consulting Agreement, and that the agreement unambiguously establishes ECGI's "unconditional and absolute" obligation to pay plaintiff. In opposition, ECGI disputes the validity of the Consulting Agreement, arguing that it lacks consideration, is unconscionable, and is the product of fraudulent inducement. In the alternative, ECGI asserts that Bentivoglio was the breaching party.

A.  The Undisputed Facts Establish
ECGI's Breach of the Consulting Agreement

To establish a claim for breach of contract, the plaintiff must prove "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages."  Second Source Funding, LLC v. Yellowstone Capital, LLC, 144 A.D.3d 445, 445–46 (1st Dep't 2016); see also Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 142 (2d Cir. 2011).  Bentivoglio has come forward with evidence which establishes all four elements. In response to the motion, ECGI does not contest the existence of the Consulting Agreement, its unambiguous payment terms and the cessation of payments in June 2017.  (Pl. 56.1 ¶¶ 3, 10–14, 27; Def. 56.1 Resp. ¶¶ 3, 10–14, 27.)

ECGI argues that Bentivoglio did not adequately perform under the Consulting Agreement.  But its argument fails in view of the unambiguous terms of the Consulting Agreement providing that ECGI's obligation to pay Bentivoglio is "unconditional and absolute," even in the event of an "actual breach."  (Consulting Agreement at ¶ 2.5.)  It explicitly states that Bentivoglio must be paid even in the event of his "death or disability" or "alleged or actual breach. . . of any of the terms of th[e] agreement. . . ."  (Id. at ¶¶ 2.5, 9.1.)

Under New York law, "interpretation of an unambiguous contract provision is a function for the court, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument. . . ."  Teitelbaum Holdings, Ltd. v. Gold, 48 N.Y.2d 51, 56 (1979).  The Consulting Agreement manifests an intention of the parties to make Bentivoglio's right to receive payment not dependent upon the outcome of any future dispute as to adequacy of his contractual performance.  ECGI took the economic risk that Bentivoglio would die or fail to perform and yet it would remain obligated to pay him.  The Court will give the "unconditional and absolute" obligation to pay its intended

5

meaning.  If Bentivoglio failed to perform services required under the Consulting Agreement, something he vehemently disputes, it did not excuse ECGI's obligation to make payment under Paragraphs 2.1 and 2.2 of the agreement.  However, the unconditional payment obligation did not insulate Bentivoglio from a claim for money damages or injunctive relief flowing from any breach of the Consulting Agreement.  But no counterclaim has been asserted in this action.

"In a breach of contract action, summary judgment is appropriate '[w]here the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning.' " Fulton Cogeneration Associates v. Niagra Mohawk Power Corp., 84 F.3d 91, 98 (2d Cir. 1996) (quoting Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir. 1985)).  The language of the Consulting Agreement is unambiguous.  ECGI had an unconditional obligation to pay Bentivoglio for the four-year term.  Because ECGI indisputably ceased payments to Bentivoglio, it stands in breach of the Consulting Agreement.

B.  ECGI's Defenses Fail as a Matter of Fact or Law.

In opposition to Bentivoglio's motion for summary judgment, ECGI asserts that the contract is unenforceable because it is unconscionable, lacks consideration or was materially breached by Bentivoglio.  It also argues that it was fraudulently induced into entering into the Consulting Agreement based on alleged misrepresentations and omissions made during the negotiation process.  ECGI bears the burden of proof with regard to these defenses.  APS Tech., Inc. v. Brant Oilfield Mgmt. & Sales, Inc., 13-cv-6500, 2015 WL 5707161, at *5 (S.D.N.Y. Sept. 29, 2015) (Swain, J) (collecting cases).  As such, it must show that the raised defenses present "disputes over facts that might affect the outcome of the suit under governing law." Anderson, 477 U.S. at 248.  The Court concludes that, on the evidence presented, no reasonable fact finder could find in ECGI's favor on any of these defenses.

1.  <u>Prior Material Breach</u>

Despite the unconditional obligation to pay,  ECGI argues that Bentivoglio

materially failed to perform or breached the agreement thereby excusing its own performance.

<u>See</u> <u>Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.</u>, 500 F.3d 171, 186 (2d Cir.2007)

("Under New York law, a party's performance under a contract is excused where the other party

has substantially failed to perform its side of the bargain or, synonymously, where that party has

committed a material breach.") (citing <u>Hadden v. Consol. Edison Co. of N.Y.</u>, 34 N.Y.2d 88, 96

(1974)).

According to ECGI, Bentivoglio breached his obligations under the Consulting

Agreement by not producing documentary evidence or meeting with ECGI management to

explain certain expenses.  ECGI does not cite to any clause in the contract that imposed an

obligation on Bentivolio to do these things, because none exists.  In fact, the February 10, 2017

"Dispute Resolution Notice" that ECGI sent to Bentivoglio explicitly admitted that "there is not

a provision requiring [Bentivoglio] to substantiate his expenditures in any agreement. . . ."  (Doc

125 – Ex. A at 3.)

The Consulting Agreement requires Bentivoglio to turn over "Company property.

. . provided to the Consultant by the Company *in connection with his duties under this

Agreement*. . . ."  (Consulting Agreement at ¶ 9.4 (emphasis added).)  It also requires him to

relinquish possession of any "Confidential Information" as defined by the Consulting

Agreement, which includes things like "inventions, brand names, software designs," "passwords

to computer network(s) and computer programs" and "the Company's intellectual property, trade

names and copyrights."  (<u>Id</u>. at ¶¶ 4.1, 4.4.)  This language does not cover the expense

documents from Bentivoglio's time as an officer of the company.

Bentivoglio and ECGI also entered into an agreement providing Bentivoglio with a lump-sum payment for his termination from the company (the "Separation Agreement").  (Doc 119 – Ex. 2.)  The Separation Agreement requires Bentivoglio to "deliver to the Company any Company property and documents in his possession. . . ."  (Id. at ¶ 8.)  However, the Separation Agreement contains separate undertakings that are not at issue on Bentivoglio's claim for breach of the Consulting Agreement.  The Consulting Agreement states that it is "a single, integrated, written contract expressing the entire agreement between the parties. . ." and that "each party represents and warrants to the other party that such party is not relying on any promises or representations that do not appear written herein."  (Consulting Agreement at ¶ 13.)  Giving full effect to the intent of the parties as reflected in the unambiguous integration clause in the Consulting Agreement, a purported breach of the Separation Agreement does not amount to a breach of the Consulting Agreement.

ECGI argues that Bentivoglio also breached the Consulting Agreement by not "meeting with then new management to review the expenses ECGI identified on a spreadsheet and explaining their purpose. . . ."  (Doc 118 at 15.)  But as this Court has already noted, the issue is not whether Bentivoglio breached the Consulting Agreement but the permissible remedy for a breach.  The Consulting Agreement does not foreclose the possibility of ECGI bringing a breach claim against Bentivoglio for proven money damages or injunctive relief.  It simply deprives ECGI of the remedy of suspending the unconditional payments to Bentivoglio because of a claim of an "actual breach."

## 2. Lack of Consideration.

ECGI  also argues that the Consulting Agreement is unsupported by consideration.  The argument is premised on the contractual clause requiring ECGI to pay

Bentivoglio even if he breaches the terms of the agreement.  According to ECGI, such a clause renders any promise or benefit provided by Bentivoglio illusory.  "Under New York law, to be valid, a contract must be supported by consideration."  Genger v. Genger, 76 F. Supp. 3d 488, 498 (S.D.N.Y. 2015) (citing Murray v. Northrop Grumman Info. Tech., Inc., 444 F.3d 169, 178 (2d Cir. 2006).  "Consideration to support an agreement exists where there is 'either a benefit to the promisor or a detriment to the promisee.' "  Id. (quoting Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 464 (1982)).

The Consulting Agreement recites that the consideration for the agreement is "the Consulting Services and the other rights granted to the Company in this Agreement." (Consulting Agreement at ¶ 2.1.)  These other benefits to ECGI were substantial.  Bentivoglio agreed to a five-year, worldwide non-compete and non-solicitation clauses, id. at ¶¶ 5–6, perpetual confidentiality and non-disparagement clauses, id. at ¶¶ 4, 7, and a broad intellectual property provision requiring him, among other things, to undertake certain steps and execute appropriate documents, if necessary, to secure ECGI's rights in intellectual property, id. at ¶ 3.

ECGI agreed to pay him a consulting fee and additional payment, id. at ¶¶ 2.1– 2.2, and refrain from disparaging him, id. at ¶ 7.  The fact that the obligation to pay under paragraphs 2.1 and 2.2 of the Consulting Agreement is "unconditional and absolute" does not mean that the Consulting Agreement is unsupported by consideration.  ECGI gained the benefit of the valuable provisions referred to above.  Significantly, ECGI's unconditional obligation to pay does not mean that Bentivoglio can breach the Consulting Agreement with impunity. Nothing in the Consulting Agreement extinguishes ECGI's right to pursue a breach of contract claim against Bentivoglio for provable money damages or injunctive relief.

The contract was negotiated by sophisticated parties represented by lawyers, in the context of Bentivoglio's departure from the company and the transfer of his 3,500,000 shares.  (See Doc 113 – Ex. A at 5 (Blom deposition describing the negotiating and signing of the agreement).)  This is not an illusory contract; it was carefully negotiated and tailored to the goals of both parties.  As the Consulting Agreement itself manifests, it is supported by adequate consideration.  (Consulting Agreement at ¶ 2.)

3.  Unconscionability

ECGI next argues that the Consulting Agreement is unenforceable because it is unconscionable.  The argument is based on ECGI's obligation to pay Bentivoglio even if he does not perform service.  As the Court has noted, the Consulting Agreement does not extinguish a claim for money damages or injunctive relief by ECGI in the event of a provable breach by Bentivoglio.

"Under New York law, a contract is unconscionable when it is 'so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms.' "  Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 121 (2d Cir. 2010) (quoting Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 10 (1988)).  "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made," which means a showing of "absence of meaningful choice on the part of the parties together with contract terms which are unreasonably favorable to the other party."  Gillman, 73 N.Y.2d at 10 (citation and internal quotation marks omitted).

ECGI has not come forward with evidence which if believed by the fact finder would permit it to find that the Consulting Agreement is either procedurally or substantively

unconscionable.  In support of its claim of procedural unconscionability, ECGI offers the

declarations of Gary Blom, Bentivoglio's successor, and Frank Sgro, the individual who

purchased Bentivoglio's 3,500,000 shares of ECGI.  Both individuals assert that Bentivoglio

"abused his exclusive control over the company to extract unusually one-sided terms. . .

threaten[ing] the shareholders that, unless his terms were accepted, he would sell the company

and/or its intellectual property to investors in New York without our approval, while securing an

extravagant salary for himself."  (Doc 120 at ¶ 5; see also Doc 119 at ¶ 20.)  But in opposing

summary judgment, "the nonmoving party may not rely on conclusory allegations or

unsubstantiated speculation." Fujitsu Ltd. v. Federal Exp. Corp., 247 F.3d 423, 428 (2d Cir.

2001) (quoting Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)).  ECGI has failed to come

forward with evidence showing how Bentivoglio abused his power to extract one-side terms

other than stating that he would look to sell assets of the corporation or perhaps his shares to

others.  Blom states that up until November 1, 2016, Bentivoglio was the sole director and

officer of the Company and its only employee.  (Doc 119 at ¶ 13.)  ECGI has not established that

as sole director of ECGI, he did not have the right to sell assets of the corporation for fair value

to others, or to sell his own shares to whomever he chose.

Certainly, ECGI had the right to pursue any remedy available to it for wrongdoing

by its officer-director-employee in offering assets for sale in some unlawful or improper manner.

Sgro, a pre-existing shareholder, was not without remedy if he thought the corporation was being

wronged.  Shareholders of a Nevada corporation, such as ECGI, generally have the right to bring

a derivative action in the name of and on behalf of the corporation for some actionable wrong to

the corporation.[3]  Also, a purchasing shareholder had the freedom to seek written representations

---

[3]  Rule 23.1 of the Nevada Rules of Civil Procedure (Derivative Actions by Shareholders).

and warranties from the selling shareholder and if those representations or warranties were breached, the purchasing shareholder would have a remedy.  Of course, if the selling shareholder were unwilling to make the requested representations and warranties, the purchasing shareholder had the freedom to walk away from the deal.

Procedural unconscionability looks to a range of factors, such as "the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was a disparity in bargaining power." Gillman, 73 N.Y.2d at 11 (citations omitted).  Both sides were represented by sophisticated attorneys.  (Doc 113 – Ex. A at 5.)  New York courts have found that procedural unconscionability does not exist where "the party complaining is commercially sophisticated." SOL Grp. Marketing Co. v. Lines, 14-cv-9929, 2016 WL 205444, at *7 (S.D.N.Y. Jan. 15, 2016) (Stein, J) (collecting cases).  ECGI is a sophisticated party, who was represented at negotiation by capable lawyers.  When viewing the transaction as a whole, no reasonable fact finder could find procedural unconscionability.

To avoid this lack of procedural unconscionability, ECGI looks to "exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." Gillman, 73 N.Y.2d at 12.  ECGI has failed to come forward with evidence which, if believed, would entitle it to judgment in its favor on substantive unconscionability.  It relies on an inapposite New York County Civil Court decision, Lease Finance Grp. LLC v. Indries, 49 Misc.3d 1129(A), 2015 WL 8544338 (Civ. Ct. N.Y. Cnty. Dec. 9, 2015).  First, the unconscionable clause there required a $2,600 dispute between two Californian entities to be litigated in a New York forum.  The court concluded that the clause was not to "provide certainty and predictability . . . but rather to increase the likelihood of

obtaining a default judgment. . . ." Id. at *6 (citation omitted).  Second, although the judge

purported to make his ruling on substantive unconscionability, procedural unconscionability

factors were heavily weighed.  The judge distinguished the case from New York's general rule to

uphold forum selection clauses by noting that "the Defendant [was] neither a sophisticated

business entity, nor an investor . . . but rather an immigrant whose first language is not English

and whose education level is equivalent to the eighth grade in the United States."  Id. (citations

omitted).  The circumstances surrounding the Consulting Agreement are quite different.  As

noted, it was negotiated between sophisticated parties, represented by lawyers who were

presumably well versed in the language and meaning of the terms.  Though ECGI agreed to an

"unconditional and absolute" payment obligation, it also obtained valuable non-compete, non-

solicitation, confidentiality and intellectual rights clauses. The agreement is not substantively

unconscionable.

### 4.   Fraudulent Inducement

ECGI's final argument is that the Consulting Agreement is voidable because it

was fraudulently induced into entering it.  Fraudulent inducement under New York law requires

proof of "(1) a representation [or omission] of material fact, (2) which was untrue, (3) which was

known to be untrue or made with reckless disregard for the truth, (4) which was offered to

deceive another or induce him to act, and (5) which that other party relied on to its injury."

Aetna Cas. and Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 580 (2d Cir. 2005).  The

circumstances amounting to fraud must be alleged with particularity per the requirements of Rule

9(b), Fed. R. Civ. P.  State Street Global Advisors Trust Co. v. Visbal, 462 F. Supp. 3d 435, 439–

40 (S.D.N.Y. 2020) (Woods, J) (citation omitted) (describing the requirements of fraudulent

inducement as an affirmative defense); see also Cortes v. 21st Century Fox America, Inc., 751

Fed. App'x 69, 72 (2d. Cir. 2018) (summary order) ("9(b) requires that, to be pursued in federal court, any such claims . . . must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' ") (quoting Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d. Cir 2006)).

ECGI asserts that during the negotiation of both the Consulting Agreement and the Separation Agreement, Bentivoglio failed to disclose the company's insolvency and his misappropriation of corporate funds.  It argues that Bentivoglio had an obligation to disclose these facts, and that had these facts been revealed, "the agreements would not have been executed."  (Doc 118 at 14.)  ECGI's phrasing muddles the issue before the Court.  Bentivoglio has moved for summary judgment on the issue of breach of the Consulting Agreement.  The enforceability of the Separation Agreement is not before the Court.  No counterclaim has been asserted by ECGI.

A party seeking fraud by omission must prove "that the plaintiff had a duty to disclose the concealed fact." Merrill Lynch, 500 F.3d at 181.  ECGI argues that Bentivoglio had a duty to disclose his alleged misappropriation of company funds because he was a fiduciary of the company, or in the alternative, under the "special facts doctrine."  (Doc 118 at 8.)  Neither doctrine applies.  First, Bentivoglio was not acting as a fiduciary in negotiating the Consulting Agreement.  The agreement became effective when he was no longer an officer of ECGI; Gary Blom signed on ECGI's behalf, and Bentivoglio signed as "Consultant."  (See Consulting Agreement at 10–11 (signature pages).)  Moreover, in negotiating the agreement, Bentivoglio was acting "not in his capacity of a director or officer for the corporation, but as an individual transacting with the corporation." Bensen v. Am. Ultramar Ltd., No. 92-cv-4420, 1997 WL

14

66780, at *23 (S.D.N.Y. Feb. 14, 1997) (Buchwald, MJ).  As then-Magistrate Judge Buchwald

held, fiduciary duties are owed to entities when directors or officers are acting "in their official

capacities on behalf of the corporation."  Id.  This does not extend to individual negotiations

between the officer and the corporation—otherwise, every such negotiation would be a breach of

fiduciary duty as the officer puts his or her desires for individual compensation above the

shareholders' desire to cap expenses.  See also In re Walt Disney Co. Derivative Litig., 825 A.2d

275, 290 (Del. Ch. 2003) ("an officer may negotiate his or her own employment agreement as

long as the process involves negotiations performed in an adversarial and arms-length manner");

Rocky Mountain Power Co. v. Hamlin, 73 Nev. 87, 91 (1957) (ratifying transaction "between a

director and his corporation . . . made at arm's length and with full disclosure of the

circumstances.") (citation omitted).

        ECGI has not demonstrated that Bentivoglio had a duty to disclose under the

special facts doctrine either.  The doctrine requires proof that "(1) one party has superior

knowledge of certain information; (2) that information is not readily available to the other party;

and (3) the first party knows that the second party is acting on the basis of mistaken knowledge."

Travelers Indem. Co. of Illinois v. CDL Hotels USA, Inc., 322 F. Supp. 2d 482, 499 (S.D.N.Y.

2004) (quoting Banque Arabe et Internationale D' Investissement v. Maryland Nat. Bank, 57

F.3d 146, 155 (2d Cir. 1995)).  ECGI offers proof in the form of a Collins-Barrow accounting

report indicating that ECGI was insolvent as of November 2, 2016.  (See Doc 119 – Ex. 4.)  But

beyond the conclusory assertion that Bentivoglio possessed "exclusive access to the company's

financial information," they have submitted no evidence demonstrating that Bentivoglio knew

and concealed the insolvency, or that the information was not reasonably available during

negotiations.  Indeed, there is no evidence that Bentivoglio's financial management of the company was ever a subject of the negotiations of the Consulting Agreement.

Fraudulent inducement by omission also requires that the omitted fact be material. An omission is material if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question," or "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it."  Barron Partners, LP v. LAB123, Inc., 593 F. Supp. 2d 667, 672 (S.D.N.Y. 2009) (Rakoff, J) (citation and internal quotation marks omitted).  The financial state of ECGI may have been material to the Separation Agreement.  It may have been material to the agreement by which Bentivoglio transferred his 3,500,000 shares of the company to Sgro.  But the Consulting Agreement explicitly states that it is "a single, integrated, written contract expressing the entire agreement between the parties with regard to the matters set forth herein."  (Consulting Agreement at ¶ 13.)  The Consulting Agreement is distinct from the Separation Agreement and the financial state of the company has not been shown to have been material to the Consulting Agreement.

Finally, on this record, no reasonable fact finder could conclude that ECGI reasonably relied upon Bentivoglio's silence concerning the financial state of the company or his expense practices.  According to ECGI's incoming CEO Gary Blom, who participated in the negotiation of the November 1, 2016 Consulting Agreement, it was known months before the agreement was signed that Bentivoglio "blocked all transparency about the company's finances." As he states in his declaration:

By the summer of 2016, Bentivoglio's relationship with ECGI's

shareholders had become completely dysfunctional. Bentivoglio blocked all transparency about the company's finances. After storming out of a shareholders' meeting, he engineered amendments to ECGI's by-laws that stripped shareholders of the right to call a special meeting, and imposed a fee-shifting obligation on shareholders that commenced unsuccessful litigation against the company with no corresponding fee-shifting in favor of shareholders.

Doc 119 at ¶ 17.

Despite this, there is no claim that ECGI made any inquiry of Bentivoglio regarding the company's financial condition or his expense reporting, or sought any representation or warranty from Bentivoglio regarding them.  Given the acrimony between Bentivoglio and ECGI, the Company "can hardly claim with any credibility that [it] . . . entered into the resulting agreement[] lulled by faith or trust in the parties across the bargaining table. . . ."  Shea v. Hambros PLC, 244 A.D.2d 39, 47 (1st Dep't 1998).

"New York courts are generally skeptical of claims of reliance asserted by 'sophisticated businessmen engaged in major transactions [who] enjoy access to critical information but fail to take advantage of that access.' "  Merrill Lynch, 500 F.3d at 181 (quoting Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir. 1984)).  Here, ECGI and Bentivoglio were both sophisticated, and engaged large law firms to help negotiate Bentivoglio's separation.  ECGI cannot claim to have relied on Bentivoglio's failure to disclose ECGI's financial condition or his expense reporting practices.  They could have performed the requisite due diligence to ascertain the company's financial health and his expenses prior to entering into the agreements, or at the very least, obtained representations and warranties from Bentivoglio sufficient to protect ECGI's new management and ownership.

Unless bargained away, ECGI has (or has had) the full arsenal of remedies to pursue Bentivoglio for managing the affairs of ECGI and his expense reporting, including a suit

for breach of fiduciary duty.  Given the acknowledgement that by the summer of 2016

"Bentivoglio blocked all transparency about the company's finances," no reasonable fact finder

could conclude that ECGI relied upon Bentivoglio to make an unprompted disclosure regarding

any discrepancy in his expense reporting in connection with the Consulting Agreement.

CONCLUSION

        For the reasons stated above, Bentivoglio's motion for summary judgment on the

remaining breach of contract claim is GRANTED.  He has met the elements of breach of

contract under New York law, and ECGI's defenses do not raise any genuine issues of material

fact.  Plaintiff shall submit a proposed judgment within fourteen (14) days of this Order.

Pursuant to Rule 54(d)(2)(B), Plaintiff may submit his application for attorney's fees and

expenses within fourteen (14) days after the entry of judgment.  The Clerk is directed to

terminate the motion (Docs 110, 126).

        SO ORDERED.


P. Kevin Castel
United States District Judge


Dated: New York, New York
      February 24, 2021